
# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## A-LAST AMANTO SIMIRON,
Defendant-Appellant.

Supreme Court Case No. CRA20-001
Superior Court Case No. CF0115-17

## OPINION

## Cite as: 2021 Guam 16

Appeal from the Superior Court of Guam
Argued and submitted on February 3, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
James M. Maher, *Esq.*
Law Office of James M. Maher
238 Archbishop Flores St., Ste. 300
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr.
Tamuning, GU 96913



**E-Received**
11/29/2021 3:53:58 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, J.:**

[1]     Defendant-Appellant A-Last Amanto Simiron appeals his convictions for Murder (as a First Degree Felony), Manslaughter (as a First Degree Felony), Aggravated Assault (as a Second Degree Felony), Theft of a Motor Vehicle (as a Second Degree Felony), Aggravated Assault (as a Third Degree Felony), and Assault (as a Misdemeanor).  On appeal, Simiron argues: (1) the trial court committed plain error when it failed to properly instruct the jury on the justification defense of defense-of-another; and (2) the trial court abused its discretion when it failed to instruct the jury that its intoxication instruction applied to the murder and manslaughter offenses. For the reasons below, we affirm the judgment of conviction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     Based on events that led to the death of Gilbert Alvarez, Jr., a grand jury returned an indictment charging Simiron and his co-defendant Mallo Mangof Sally[1] with Aggravated Murder (as a First Degree Felony), Murder (as a First Degree Felony), Manslaughter (as a First Degree Felony), First Degree Robbery (as a First Degree Felony), Second Degree Robbery (as a Second Degree Felony), Aggravated Assault (as a Second Degree Felony), Theft of a Motor Vehicle (as a Second Degree Felony), Aggravated Assault (as a Third Degree Felony) (two charges), and Criminal Mischief (as a Third Degree Felony).[2]  Each of the charges—except for the last charge—included a Special Allegation of Use of a Deadly Weapon in the Commission of a Felony.  At trial, the following evidence was presented.

---

[1] The trial court ordered that Sally's trial be severed from Simiron's.

[2] The indictment was amended to reflect the charges brought forth during Simiron's trial.

**[3]**      During the early morning hours of February 24, 2017, Laura Biggs arrived at the University of Guam ("UOG") for a morning run.  As she drove into the campus, Biggs noticed the body of a person "slumped over" by a concrete pole near a fence.  Biggs testified the person did not look awake, so she immediately parked her vehicle and called campus security.  Tommy Lee Santos, a campus security officer, responded to the incident.  Santos testified that when he arrived at the scene, he noticed a male individual lying face down on the ground with his forehead bleeding.  After confirming the individual did not have a pulse and appeared to make no movement or noise, Santos called law enforcement.

**[4]**      Henry Fegurgur, an advanced life support technician with the Guam Fire Department, responded to the scene.  Fegurgur testified that when he arrived, other responders were conducting cardiopulmonary resuscitation ("CPR") on the individual and that he was informed the individual suffered from massive trauma to his head and face and was in cardiac arrest.  Fegurgur also testified that he was unable resuscitate the individual.  The individual was eventually transported to Naval Hospital.  Through a "fingerprint hit," the individual was identified as Alvarez.

**[5]**      Medical Examiner Dr. Aurelio Espinola conducted an autopsy of Alvarez and determined he died of basilar skull fracture and laceration of the face, which led to cardiac arrest.  Dr. Espinola testified that Alvarez's lacerations were "severe" and included: a laceration from the bottom of the lip to the bottom of the nostril; a large laceration on the forehead; and a laceration over the right eye.  Transcript ("Tr.") at 34-36 (Jury Trial, Oct. 24, 2018).  Dr. Espinola determined that because of their shape and size, such lacerations were likely caused by an object.  Dr. Espinola also noted that Alvarez had a fractured jaw and a crack in his anterior cranial fossa.

[6]      After Alvarez was transported to Naval Hospital, Guam Police Department ("GPD")

officers secured the scene at the UOG.  Officer Kenneth Espinosa, a crime scene investigator,

testified he confiscated evidence and took photographs of areas at the scene with suspected

blood.  These photographed areas included the ground where Alvarez's body was found and a

concrete pole and fence line nearby.  Officer Espinosa observed that the suspected blood on the

concrete pole appeared to be blood castoffs, "meaning there was some pressure that caused [the

blood] to go there."  Tr. at 57 (Jury Trial, Oct. 25, 2018).  Officer Espinosa also confiscated a

religious necklace and a possible human tooth from the scene.

[7]      Detective Jeremiah De Chavez, who was tasked as one of the primary investigators, also

responded to the scene.  Detective De Chavez testified that after he learned the body found at

UOG belonged to Alvarez, he met with John Tedtaotao.  Tedtaotao identified himself as

Alvarez's stepfather.  During this encounter, Tedtaotao informed Detective De Chavez that a

black pickup truck he lent Alvarez was found crashed that morning in Yigo.  Detective De

Chavez proceeded to the scene of the crash and learned from witnesses in the area that two male

individuals—one of whom was identified as Simiron—had been seen with the truck.

[8]      Detective De Chavez testified that he located and interviewed Simiron, who at first

denied any involvement with Alvarez's death.  Upon further questioning, Simiron admitted to

the events that led to Alvarez's death.  Detective De Chavez testified that Simiron confessed as

follows:

> [Simiron] identified to have been at the Mangilao baseball field[3] with a friend he
> identified to be [Sally]. . . .  He stated that he saw an individual at the dugout, . . .
> and that there was a vehicle there.
>
>         [Simiron] approached the individual and asked [him for] a ride. . . .
> [Simiron] told also [sic] the individual that his friend also needed a ride and that

---

[3] Simiron told Detective De Chavez that while at the baseball field, he and Sally drank "a half gallon of vodka," which they mixed with black tea.  Tr. at 63 (Jury Trial, Oct. 23, 2018).

the individual agreed. He did not know who that person was, stated that they end up getting into the vehicle. [Simiron] was in the front passenger seat and . . . [Sally] was in the backseat, right behind him.

. . . .

During the transport, [Sally] kept trying to tell [Simiron] to hit the driver, to strike the driver, and [Simiron] stated he didn't want to. They drove up to President's Lane, and that's when [Simiron] stepped out of the vehicle and he hears striking inside the vehicle. And [Simiron] identified he heard [Sally] punching the driver. He stated he didn't see it, but he heard it.

He goes around the vehicle, and he grabs the driver from behind and describing it to be a rear naked choke hold, pulling the driver out of the vehicle, and then the driver was actually armed with a pipe.

. . . .

From that point, [Simiron] remembered punching the driver in the face a couple of times, and then he disarmed the driver from the pipe, having it -- described it on the ground, where [Sally] came out of the vehicle and picked up the pipe and struck the driver in the face a couple of times, accidentally even striking [Simiron] on the head.

Tr. at 37-38 (Jury Trial, Oct. 23, 2018).

[9]     Detective De Chavez testified that Simiron told him the reason he grabbed Alvarez from behind was that he saw Alvarez about to hit Sally with a metal pipe. Simiron further told Detective De Chavez that while keeping Alvarez in a chokehold, he took Alvarez away from the vehicle and brought him towards a concrete pole. Detective De Chavez testified that Simiron, while maintaining his chokehold on Alvarez, told Sally to hit Alvarez with the metal pipe.[4] "From that point, [Simiron] stated that when he noted [Alvarez] wasn't breathing anymore, he said he released the chokehold and that [Alvarez] was gasping for air." Tr. at 40 (Jury Trial, Oct. 23, 2018).

---

[4] Simiron admitted in a written statement: "I grabbed the pipe, threw it away. [Sally] took it from the ground, and I told him to whack [Alvarez] over and over." Tr. at 49 (Jury Trial, Oct. 23, 2018); Trial Ex. 21C (Statement Form, Feb. 28, 2017).

[10]    Following these events, Simiron told Detective De Chavez that he and Sally got into the truck that Alvarez was driving and drove towards Dededo, where they stopped at a gas station and a convenience store to get beer. Video surveillance footage captured at the Maxi Mart in Dededo and published to the jury showed Simiron arriving with a truck and entering and exiting the store. The two men proceeded to Yigo and crashed the truck into a concrete pole.

[11]    Simiron's written statements to law enforcement explaining the events he described to Detective De Chavez, and a video reenactment by Simiron at the Mangilao baseball field and UOG, were admitted into evidence and provided to the jury. The jury was also provided a custodial interrogation form signed by Simiron stating he understood his Miranda rights.

[12]    Officer Shawn Ayuyu, who was with Detective De Chavez during the interview with Simiron, testified that he observed injuries on Simiron's face and that Simiron stated the injuries resulted from the altercation between him and Alvarez. Simiron also informed Officer Ayuyu about the clothing he was wearing during the altercation with Alvarez. Officer Ayuyu confiscated this clothing, including a pair of shorts, from Simiron's sister's residence. Officer Ayuyu testified he observed "red spots" on these shorts, so he requested for analysis. Tr. at 26-27 (Jury Trial, Oct. 25, 2018).

[13]    The shorts confiscated by Officer Ayuyu were sent to the Federal Bureau of Investigations ("FBI") laboratory for DNA testing. Tiffany Smith, a forensic examiner with the DNA Case Unit of the FBI, testified that she identified blood on three different portions of Simiron's shorts. Smith testified that based on her analysis, a DNA sample taken from a bloodstain on the right side of Simiron's shorts was 10 octillion times more likely to have come from Alvarez than from a random, unrelated individual. According to Smith, Simiron and Sally were excluded as contributors of the DNA, "meaning those individuals could not have left [the]

DNA profile" found on the shorts. Tr. at 13-14 (Jury Trial, Oct. 24, 2018) (Excerpts: Smith Test). Smith also examined DNA samples from two bloodstains on the left side of the shorts and in the inside portion of the shorts. As to those samples, Smith testified that testing confirmed the mixture of DNA from two individuals, one of which matched to Simiron. Smith stated the match with Simiron "provides support for identification [that Simiron is] a contributor" to the mixtures of DNA in the two samples. *Id.* at 15.

[14]    Smith also conducted DNA testing on blood samples taken from various locations on the truck where the altercation began and at the scene where Alvarez's body was discovered. Smith testified the DNA samples of blood taken from the handle of the exterior passenger door, the passenger door panel, the right side of the passenger seat, and the passenger door armrest all matched with Alvarez, as did other samples of blood taken from the ground near where Alvarez's body was discovered and from a nearby fence. Smith also testified that a separate blood sample taken from the passenger door armrest of the truck matched with Simiron.

[15]    Susan Marvin, a metallurgist forensic examiner with the FBI, testified on forensic testing of the possible human tooth confiscated at the scene by Officer Espinosa. Marvin stated that she "examined [the] tooth and located zinc particles that were on the tooth associated with the areas of the tooth that were fractured." Tr. at 7 (Jury Trial, Oct. 26, 2018) (Excerpts: Marvin Test). She testified, "The zinc particles associated with the fracture zones were actually slightly embedded into the surface [of the tooth] at those fracture zones." *Id.* at 7-8. When asked by the People where the zinc could have come from, Marvin opined that many objects could have generated zinc, but that "[q]uite often steel pipes are coated with zinc to protect them from corrosion." *Id.* at 9.

**[16]**   After the close of the People's case-in-chief, Simiron declined to present any evidence. *See* Tr. at 54 (Jury Trial, Oct. 29, 2018) (Defense counsel: "The defense will announce rest, will not put on any evidence, and will instead rely upon the state of the Government's case.").

**[17]**   Following closing arguments,[5] the trial court provided the jury with its final instructions, which included an instruction as to intoxication:

**JURY INSTRUCTION NO. 3N**

**INTOXICATION AS A DEFENSE**

Intoxication is not a defense to a criminal charge.  Evidence of intoxication is admissible whenever it is relevant to negate or to establish an element of the offenses charged.

A person is reckless with respect to an element of the offense, even though his disregard thereof is not conscious, if his not being conscious thereof is due to self-induced intoxication.
Self-induced intoxication means intoxication caused by substances which the person knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would otherwise afford a defense to a charge of crime.

Record on Appeal ("RA"), tab 69 at 42 (Jury Instrs., Nov. 5, 2018).

**[18]**   Over defense counsel's objection, the trial court determined that application of the intoxication instruction did not apply to the offense of Murder (as a First Degree Felony) or Manslaughter (as a First Degree Felony) because of the "recklessly" *mens rea* contained therein. The trial court instructed:

**JURY INSTRUCTION NO. 3O**

**SPECIFIC DEFENSE: INTOXICATION**

Evidence has been admitted that the defendant may have been intoxicated at the time that the crime charged was committed.  You may consider evidence of the defendant's intoxication in deciding whether the government has proved

---

[5] Simiron declined to present closing arguments to the jury.

beyond a reasonable doubt that the defendant acted with the intent required to commit the following charges:

- Charge Four First Degree Robbery (as a 1st Degree Felony);

- Charge Five Second Degree Robbery (as a 2nd Degree Felony);

- Charge Seven Theft of a Motor Vehicle (as a 2nd Degree Felony); AND

- For all Special Allegations: Possession or Use of a Deadly Weapon in the Commission of a Felony, that is for charges one, four, five, seven, and nine.

*Id.* at 43.

**[19]**    As for the justification defense of self-defense raised by Simiron, the trial court instructed the jury as follows:

### JURY INSTRUCTION NO. 3P

### SPECIFIC DEFENSE: SELF-DEFENSE

The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the Defendant not guilty of:

- Charge One,  Aggravated Murder (as a 1st Degree Felony);

- Charge Two, Murder (as a 1st Degree Felony);

- Charge Three, Manslaughter (as a 1st Degree Felony); and

- Negligent Homicide (as a 3rd Degree Felony) as a lesser included offense of Charge Three, Manslaughter (as a 1st Degree Felony).

*Id.* at 44; *see also* Tr. at 84 (Jury Trial, Oct. 30, 2018).  The trial court also provided the jury with

the definitions of "self-defense" and "force in defense of third person" (i.e., defense-of-another):

//

//

//

## JURY INSTRUCTION NO. 5X

### "SELF-DEFENSE" DEFINED

(a) The use of force is not justifiable to resist force used by the occupier or possessor of property or by another person on his behalf, where the defendant knows that the person using the force is doing so under a claim of right to protect the property, except that this limitation shall not apply if the defendant believes that such force is necessary to protect himself against death or serious bodily harm.

(b) The use of deadly force is not justifiable unless the defendant believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or rape or sodomy compelled by force or threat; nor is it justifiable if: (1) the defendant, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or (2) the defendant knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto.

(c) Except as otherwise required by Subsections (a) and (b), a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do or abstaining from any lawful action.

## JURY INSTRUCTION NO. 5Y

### "FORCE IN DEFENSE OF THIRD PERSON" DEFINED

The use of force upon or toward the person or another is justifiable to protect a third person when:

1. The Defendant would be justified in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect.

2. Under the circumstances as the defendant believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

3. The defendant believes that his intervention is necessary for the protection of such person.

RA, tab 69 at 80-81 (Jury Instrs., Nov. 5, 2018). Simiron proposed in part these specific instructions and did not object to their inclusion. The People, however, objected to "any instruction on self-defense." Tr. at 88 (Jury Trial, Oct. 29, 2018).

[20]     After receiving the instructions, the jury deliberated and returned guilty verdicts against Simiron for these offenses: Murder (as a First Degree Felony); Manslaughter (as a First Degree Felony); Aggravated Assault (as a Second Degree Felony); Theft of a Motor Vehicle (as a Second Degree Felony); Aggravated Assault (as a Third Degree Felony); and Assault (as a Misdemeanor) as a lesser-included offense of another charge of Aggravated Assault (as a Third Degree Felony).[6] Simiron was sentenced to life in prison with the possibility of parole after fifteen years for the offense of Murder (as a First Degree Felony) and five years for Theft of a Motor Vehicle (as a Second Degree Felony), to run consecutively to the sentence for Murder. Simiron's sentences for his other convictions were ordered to be merged and served concurrently with the sentence for Murder (as a First Degree Felony). Following the entry of judgment, Simiron timely appealed.

## II. JURISDICTION

[21]     We have jurisdiction over appeals from a final judgment of conviction entered by the Superior Court of Guam. *See* 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-57 (2021)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III. STANDARD OF REVIEW

[22]     Jury instructions not objected to are reviewed for plain error. *See People v. White*, 2020 Guam 19 ¶ 8; *People v. Gargarita*, 2015 Guam 28 ¶ 11; *People v. Aldan*, 2018 Guam 19 ¶ 11.

---

[6] The jury also returned not-guilty verdicts against Simiron for these offenses: Aggravated Murder (as a First Degree Felony); First Degree Robbery (as a First Degree Felony); Second Degree Robbery (as a Second Degree Felony) and its corresponding lesser-included offense, Third Degree Robbery (as a Third Degree Felony); Aggravated Assault (as a Third Degree Felony); and the special allegation attached to the charge of Theft of a Motor Vehicle (as a Second Degree Felony).

"Plain error is highly prejudicial error." *White*, 2020 Guam 19 ¶ 8 (quoting *People v. Felder*, 2012 Guam 8 ¶ 19). Thus, on appeal, the defendant must establish: "(1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected the defendant's substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *Id.* (citing *Felder*, 2012 Guam 8 ¶ 19). "[W]here a defendant objected to a particular jury instruction at trial, courts view the instruction in the context of the delivered jury instructions as a whole and reverse only for an abuse of discretion." *People v. Cruz*, 2020 Guam 11 ¶ 9 (alteration in original) (quoting *People v. Songeni*, 2010 Guam 20 ¶ 9).

## IV. ANALYSIS

[23]     Simiron raises two issues on appeal. First, he alleges the trial court committed plain error when it failed to properly instruct the jury on defense-of-another. Appellant's Br. at 7 (June 15, 2020). Second, he argues the trial court abused its discretion when it failed to instruct the jury that its intoxication instruction applied to the murder and manslaughter offenses. *Id.* We review these issues.

### A.  Simiron Has Not Met His Burden in Showing the Trial Court Committed Plain Error in Failing to Properly Instruct on Defense-of-Another

[24]     Simiron claims the trial court failed to properly instruct the jury on defense-of-another. Appellant's Br. at 9-11. In response, the People allege the evidence demonstrates that Simiron was not entitled to a defense-of-another instruction, and so they argue any error in the provision of the instruction cannot meet the "affecting substantial rights" prong of the plain error test. Appellee's Br. at 16 (Mar. 4, 2021). Before reviewing the alleged instructional deficiency for plain error, we address a preliminary concern raised by Simiron. Simiron contends that, because the People did not object to including the defense-of-another instruction, they "should be judicially estopped from now suggesting that no defense-of-others instruction should have been

given." Appellant's Reply Br. at 6 (Oct. 29, 2020). This assertion, however, is belied by the record.

**[25]** In *People v. White*, we held the People waived their appellate argument that a defense-of-another instruction was not required because the prosecutor in the underlying criminal matter agreed to include the instruction. 2020 Guam 19 ¶ 11. We stated, "For the people to now argue that the defense-of-another instruction provided by the trial court was 'defective' is a complete reversal of their position." *Id.* ¶ 13. We held that to consider the People's arguments on appeal "would be allowing [the People] to profit from an error they agreed with during the proceedings below." *Id.* Here, while the prosecutor did not specifically object to including a defense-of-another instruction, the prosecutor argued aggressively against "any instruction on self-defense." Tr. at 88 (Jury Trial, Oct. 29, 2018). The prosecutor raised several arguments on why no justification-defense instructions were required under the circumstances of this case. *See id.* ("[T]he third party here [Sally] initiated the conflict and was on top of the victim when the defendant decided to interact with the two people who were in the altercation."); *id.* ("[I]t is not justifiable for self-defense to resist force used by the occupier or possessor of property or by another person on his behalf."); *id.* at 89 ("[A] person assisting another in, say, a fight outside a bar, must urge his friend to retreat if retreat is possible before he can claim the right to self-defense.") (reading verbatim comment to 9 GCA § 7.88, force in defense of third person statute); *see also id.* at 91-94. Because of the relationship between self-defense and defense-of-another, and the arguments presented to the trial court, we disagree with Simiron's characterization that the People are attempting to profit from an instructional error to which they agreed. Reply Br. at 6. We think it clear that the People did not agree to the alleged instructional error. Therefore, it

is not improper to consider the People's argument that a defense-of-another instruction was not required.

### 1. The trial court committed instructional error that was clear and obvious under current law

[26]    Like the appellant in *White*, Simiron argues the trial court's instructions were erroneous because they neither informed the jury that the prosecution bore the burden of disproving defense-of-another beyond a reasonable doubt nor informed the jury that it had to acquit Simiron if the prosecution failed to meet that burden. Appellant's Br. at 7-11. In support of these arguments, Simiron relies on the court's decision in *People v. Gargarita*, 2015 Guam 28, which explained that the trial court must provide clear instructions as to the prosecution's burden to disprove a justification defense. *Id.* at 9-11. The People agree that these instructions were erroneous, conceding:

> [T]he defense of others instruction in this case likely meets the first prong of the plain error test, because it is error to omit the People's burden of proof from a justification jury instruction. The instruction probably meets the second prong of the plain error test as well, i.e., that the error is clear or obvious under current law, given the similarity between the two justification defenses, defense of others and self-defense.

Appellee's Br. at 20. Following our decisions in *Gargarita* and *White*, we agree with both Simiron and the People that the trial court committed an instructional error that was clear and obvious under current law.

[27]    In *Gargarita*, this court held that the trial court erred in failing to properly instruct the jury on the prosecution's burden of proof when a justification defense is given. *See* 2015 Guam 28 ¶¶ 13-18. There, after instructing the jury on the elements of the self-defense claim, the trial court instructed the jury on the definition of "justification," stating that "justification is a defense" and "the prosecution has the burden of disproving a justification beyond a reasonable

doubt." *Id.* ¶ 13. This court explained that the trial court did not "explicitly state that self-defense is a justification defense," and without making that connection or link, the jury may have improperly placed the burden on the defendant to prove that his use of force was lawful. *Id.* ¶ 15. The trial court in *Gargarita* also did not instruct the jury it must acquit the defendant if the People failed to disprove self-defense beyond a reasonable doubt. *Id.* ¶¶ 16-17. This court held these combined deficiencies to be clear and obvious error. *Id.* ¶¶ 20-22; *see also People v. John*, 2016 Guam 41 ¶¶ 36-37 (finding trial court committed clear and obvious error under *Gargarita* when it failed to instruct jury that it must acquit defendant if prosecution "failed to meet its burden on the issue of self-defense even if all of the elements of the charges against [the defendant] were met"); *People v. Kotto*, 2020 Guam 4 ¶ 39 ("The hallmark of our decision in *Gargarita* is simply that a trial court must 'instruct the jury that if the prosecution failed to disprove self-defense beyond a reasonable doubt, then the jury must acquit [the defendant] of the charges.'" (alteration in original)).

[28] In *White*, we applied the principles of *Gargarita* to a defense-of-another instruction, stating, "Though we have not specifically applied the underlying premise of *Gargarita* in a defense-of-another claim, that this rule applies in this context is clear and obvious under current law." 2020 Guam 19 ¶ 18. There, the trial court gave no instruction to the jury that the prosecution bore the burden of disproving defense-of-another, let alone that if the prosecution failed to meet its burden, the jury must acquit the defendant of the charges. *Id.* ¶ 17. We determined that "[w]ithout these instructions, the jury may have impermissibly placed the onus on [the defendant] to prove that he acted in defense of another during the altercation at dispute." *Id.*

**[29]** Here, the trial court instructed that for the "*[s]pecific defense* of self-defense[,] [t]he People have the burden of proving beyond a reasonable doubt that the killing was not justified," and that if the People have not met this burden, the jury must find Simiron not guilty of the relevant offenses. Tr. at 84 (Jury Trial, Oct. 30, 2018) (emphasis added); *see also* RA, tab 69 at 44 (Jury Instrs., Nov. 5, 2018). The instruction, however, suggested that it did not apply to defense-of-another. In failing to state—even if inadvertently—that the instruction applied to the justification defense of defense-of-another, the jury may have impermissibly placed the onus on Simiron to prove that he acted in defense of another during the altercation with Alvarez. Thus, as Simiron argues, the jury may not have understood that acquittal was required if the government failed to disprove defense-of-another beyond a reasonable doubt. *See* Appellant's Br. at 11. Because the trial court did not specifically instruct the jury that the People had the burden to disprove defense-of-another beyond a reasonable doubt, as it did for self-defense, the trial court committed instructional error that was clear and obvious under the law.

### 2. The error did not affect Simiron's substantial rights

**[30]** Having satisfied the first two prongs of plain error review, we next address whether the error affected Simiron's substantial rights. For the third prong of plain error review, we have explained:

> To establish prejudice—i.e., that his or her substantial rights were violated—under the third prong of plain error review, a defendant must show there is a "reasonable probability that the error affected the outcome of the trial." In the context of alleged instructional error, a defendant's substantial rights are violated where it is reasonably probable he would have been acquitted "had the trial court properly instructed the jury" on the elements of the offense. A defendant's substantial rights are not affected where the "prosecution presented overwhelming evidence of guilt regarding the issue or element affected by the claimed error." We review the record as a whole, and absent evidence of prejudice, the People will prevail.

*White*, 2020 Guam 19 ¶ 10 (citations omitted). In prior decisions, we have analyzed the third prong under two approaches: first, whether there was overwhelming evidence of guilt on the issue or element affected by the claimed error, *see People v. Kanistus*, 2017 Guam 26 ¶ 28; *People v. Perry*, 2009 Guam 4 ¶¶ 43, 46, and second, whether the instructional error had a prejudicial effect on the verdict, *see White*, 2020 Guam 19 ¶ 19 n.5; *Gargarita*, 2015 Guam 28 ¶ 23; *Cruz*, 2020 Guam 11 ¶¶ 17-18; *People v. Taisacan*, 2018 Guam 23 ¶ 37. Under either approach, Simiron fails to meet his burden in showing that his substantial rights were affected.

### a. There was no prejudice suffered by Simiron because the instructional error had no probable effect on the verdict

[31] In arguing that his substantial rights were affected by the instructional error, Simiron claims with no support that "[h]ad the trial court adequately and properly instructed the jury on the defense of another, it is reasonably likely it would have returned a verdict of not-guilty on murder or manslaughter or [the] aggravated assault count(s)." Appellant's Br. 13-14. We disagree with this argument for two reasons.

[32] First, even if provided adequate and proper instructions on defense-of-another, it is not reasonably probable the jury would have acquitted defendant on the charges because, as the People argue, the jury received no evidence that Alvarez was the initial aggressor. *See* Appellee's Br. at 21. Under Guam law, an individual may use force on an aggressor to defend a third person when:

> (1) the defendant would be justified under § 7.84 [self-defense] in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;

> (2) under the circumstances as the defendant believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

> (3) the defendant believes that his intervention is necessary for the protection of such other person.

9 GCA § 7.88(a) (2005); *see also* Tr. at 95-96 (Jury Trial, Oct. 30, 2018).

[33]     Here, the evidence presented to the jury shows that Alvarez did not start the physical altercation. According to statements made by Simiron to Detective De Chavez, while in the truck, "[Sally] kept trying to tell [Simiron] to hit [Alvarez], to strike [Alvarez], and [Simiron] stated he didn't want to." Tr. at 37 (Jury Trial, Oct. 23, 2018). And when Alvarez stopped the truck at UOG, and Simiron stepped out, he "heard" Sally striking Alvarez. *Id.* Detective De Chavez also testified that Simiron told him the reason he grabbed Alvarez from behind and choked him, after stepping out of the truck, was because he saw Alvarez about to hit Sally with a pipe. *Id.* at 62-63. This evidence demonstrates that Alvarez was responding to a physical altercation started by Sally, not that Alvarez was the initial aggressor.[7] Based on this evidence, it is not reasonably probable that Simiron would have been acquitted had the trial court properly instructed the jury on defense-of-another.

[34]     Second, even if provided adequate and proper instruction on defense-of-another, it is not reasonably probable the jury would have acquitted Simiron because of the trial court's related instructions on self-defense. Unlike in *White*, where the trial court instructed the jury only as to the legal definition for defense-of-another under 9 GCA § 7.88, *see* 2020 Guam 19 ¶ 24, the jury here was provided sufficient instructions on the definition and general requirements of self-defense and the use of deadly force. The trial court instructed:

> [T]he use of deadly force is not justifiable unless the defendant believes that such force is necessary to protect themself against death, serious bodily harm, kidnapping or rape or sodomy compelled by force or threat. Nor is it justifiable if

---

[7] Even if Alvarez were the initial aggressor, the defense-of-another statute explicitly imposes a duty to retreat before a defendant can avail of the justification defense if the person knows that doing so would secure the complete safety of the other person he is defending. *See* 9 GCA § 7.88(b) (2005). No evidence in the record suggests that Simiron urged or attempted retreat or that he could secure the complete safety of Sally by retreating.

one, the defendant with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter, or two, the defendant knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto.

Tr. at 95 (Jury Trial, Oct. 30, 2018); *see also* 9 GCA § 7.86(b) (2005). Because defense-of-another statutorily requires that an individual be justified under the self-defense statute to use "such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect," 9 GCA § 7.88(a)(1), the jury instructions regarding the limitations on the use of deadly force were appropriate under the circumstances.

[35] Simiron admitted to Detective De Chavez that he placed Alvarez in a rear naked chokehold, punched him in the face until he dropped the pipe he was holding, pulled him out of the truck, and dragged him towards a concrete pole. Simiron also admitted that while Alvarez was in the chokehold, Simiron told Sally to hit Alvarez with the pipe. This evidence, which is uncontested, establishes that Simiron's use of force was not justifiable because it was unnecessary to protect himself or Sally against death or serious bodily harm. It also shows that Simiron had an opportunity to safely retreat from the altercation, thereby precluding Simiron's justifiable use of deadly force under 9 GCA § 7.86(b)(2). Thus, we agree with the People that "[n]o reasonable jury could have found that Simiron's conduct amounted to lawful acts of self-defense or defense of others." Appellee's Br. at 23.

### b. Overwhelming evidence showed that Simiron did not act in defense of another

[36] Simiron presents no arguments in response to the People's assertion "that the evidence overwhelmingly shows that Simiron allowed Sally to use force far above what could be considered reasonable in proportion to the threat that he allegedly faced." Appellee's Br. at 23. The court agrees that the evidence—which includes Simiron's written statements, his video

reenactment of the crimes, and the forensic evidence—show overwhelmingly that Simiron did not act in defense of another.

[37]     Simiron told Detective De Chavez the reason he grabbed Alvarez from behind and placed him in a chokehold was because he saw Alvarez about to hit Sally with a metal pipe; Simiron then punched Alvarez in the face a "couple of times" until he dropped the pipe. Tr. at 37-38, 62-63 (Jury Trial, Oct. 23, 2018). After Alvarez dropped the metal pipe, Simiron could have ended the altercation. Instead, Simiron admitted in his written statement: "I grabbed the pipe, threw it away. [Sally] took it from the ground, and I told him to whack [Alvarez] over and over." *Id.* at 49; *see also* Trial Ex. 21C (Statement Form, Feb. 28, 2017). In a video reenactment of the incident, which was entered as evidence for the jury's consideration, Simiron admitted that he told Sally to "keep on" striking Alvarez with a metal pipe as he held him, and that he released Alvarez from the chokehold only when Alvarez tried to "catch some air." Trial Ex. 87 (Video reenactment (File EJO11, Feb. 28, 2017)). Such admissions are consistent with the findings by Dr. Espinola of the facial lacerations and fractures sustained by Alvarez, and with the uncontested DNA evidence of blood samples taken from Simiron's shorts, the truck, and the scene where Alvarez's body was discovered. Because of the overwhelming evidence that Simiron did not properly act in defense of another, a reasonable jury would have rejected his justification defense.

[38]     As Simiron fails to establish by a "reasonable probability" that but for the claimed error, the result of the proceeding would have been different, his substantial rights were not affected. Thus, we need not address the fourth prong of plain error review—whether "reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *White*, 2020 Guam 19 ¶ 8 (citation omitted).

**B.   The Trial Court Did Not Abuse Its Discretion in Refusing to Apply the Intoxication Instruction to the Offenses of Murder and Manslaughter**

[39]    Simiron argues the trial court abused its discretion in failing to instruct the jury that its instruction on intoxication applied to the offenses of murder and manslaughter.  Appellant's Br. at 7.  In response, the People argue, "The trial court did not abuse its discretion in refusing to instruct the jury on the defendant's *voluntary intoxication* as a defense to murder and manslaughter."  Appellee's Br. at 16 (emphasis added).  These crimes, as charged, have a *mens rea* requirement of recklessness.[8]  The People therefore assert that voluntary intoxication cannot negate a defendant's recklessness.  *See id.* at 16-17.  We agree with the People.

[40]    "[C]ourts are not bound to present every conceivable defense potentially suggested by the evidence."  *People v. Cox*, 2018 Guam 16 ¶ 10 (quoting *People v. Camacho*, 1999 Guam 27 ¶ 20); *see also People v. Barton*, 906 P.2d 531, 535 (Cal. 1995) ("[A] trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses . . . aris[es] 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (citations omitted)).  While "the standard is that 'an instruction must be given if there is evidence upon which the jury could rationally sustain the defense,'" *People v. Root*, 2005 Guam 16 ¶ 28 (quoting *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam)), an

---

[8] The Amended Indictment reads as follows for the offenses of Murder (as a First Degree Felony) and Manslaughter (as a First Degree Felony):

> On or about the 24th day of February, 2017, in Guam, [Simiron] did commit the offense of Murder, in that he *recklessly* caused the death of another human being, that is [Alvarez], under circumstances manifesting extreme indifference to the value of human life, in violation of 9 GCA §§ 16.40(a)(2) and (b).
>
> . . . .
>
> On or about the 24th day of February, 2017, in Guam, [Simiron] did commit the offense of Manslaughter, in that he *recklessly* caused the death of another human being, that is [Alvarez], in violation of 9 GCA §§ 16.50(a)(1) and (b).

RA, tab 64 at 3 (Am. Indictment, Oct. 30, 2018) (emphases added).

instruction need not be given if the instruction is contrary to law, *see United States v. Doe*, 705 F.3d 1134, 1144 (9th Cir. 2013) ("A criminal defendant is entitled to jury instructions related to a defense theory so long as there is 'any foundation in the evidence.' This entitlement is not unlimited, however, and any given instruction must be supported by law." (citations omitted)). Under the circumstances, an instruction applying voluntary or self-induced intoxication as a defense to Simiron's murder and manslaughter offenses would contravene 9 GCA § 7.58.

[41]      Title 9 GCA § 7.58 defines and governs how intoxication evidence may be used.[9] Section 7.58(b) explains that, except with involuntary intoxication, "intoxication is not a defense to a criminal charge," and "[e]vidence of intoxication is admissible whenever it is relevant to negate or to establish an element of the offense charged." 9 GCA § 7.58(b) (2005). "What [9 GCA § 7.58] does is state that intoxication is not a defense[,] but the fact, and degree of, intoxication is relevant to the issue of mental capacity when purpose, motive or intent is a necessary element of the crime." 9 GCA § 7.58 cmt.

---

[9] Title 9 GCA § 7.58 states in its entirety:

> (a) As used in this Section:
>
>> (1) *intoxication* means an impairment of mental or physical capacities resulting from the introduction of alcohol, drugs or other substances into the body.
>>
>> (2) *self-induced intoxication* means intoxication caused by substances which the person knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would otherwise afford a defense to a charge of crime.
>
> (b) Except as provided in Subsection (d), intoxication is not a defense to a criminal charge. Evidence of intoxication is admissible whenever it is relevant to negate or to establish an element of the offense charged.
>
> (c) A person is reckless with respect to an element of an offense, even though his disregard thereof is not conscious, if his not being conscious thereof is due to self-induced intoxication.
>
> (d) Intoxication which is not self-induced is an affirmative defense if, by reason of such intoxication, the person at the time of his conduct lacks substantial capacity either to appreciate its wrongfulness or to conform his conduct to the requirements of the law.

9 GCA § 7.58 (2005).

[42]     Most significantly, the intoxication statute states that "[a] person is reckless with respect to an element of the offense, even though his disregard thereof is not conscious, if his not being conscious thereof is due to self-induced intoxication."[10]  9 GCA § 7.58(c).  When this section is read with the definition of the culpable mental state of "recklessly" or "reckless" under 9 GCA § 4.30(c),[11] the import is that "the act of removing one's awareness of a risk by means of self-induced intoxication is therefore treated as synonymous with the conscious disregard of that risk."  *See State v. Flewelling*, 524 A.2d 765, 769-70 (Me. 1987) (interpreting similarly worded intoxication statute in conjunction with culpable mental state of "recklessly").  In other words, "[w]hen a person would have been aware of the risk but for self-induced intoxication, his 'unawareness is immaterial,' and his conduct is treated as the equivalent of consciously disregarding a risk."  *Id.* (citations omitted).  Under 9 GCA § 7.58(c) and its related provisions, self-induced intoxication is generally inapplicable as a defense to a crime where the culpable mental state is "recklessly" or "reckless."

[43]     This reasoning follows an interpretation by the North Dakota Supreme Court of an intoxication statute with the same language as 9 GCA § 7.58(c).  *See State v. Trieb*, 315 N.W.2d 649, 658 (N.D. 1982) (interpreting N.D. Cent. Code § 12.1-04-02).  In *Trieb*, the North Dakota Supreme Court stated, "[W]here recklessness, i.e., disregard of a risk, is the standard of culpability for a crime, lack of awareness of the risk because of self-induced intoxication does not negate culpability."  *Id.* (citation omitted).  The *Trieb* court also explained: "The purpose of

---

[10] Neither party raises or explains the import of 9 GCA § 7.58(c) in their briefs.  Instead, they pivot to unrelated arguments about the statutory differences between the offenses of murder and manslaughter.

[11] Under 9 GCA § 4.30(c):

> A person acts recklessly, or is reckless, with respect to attendant circumstances or the result of his conduct when he acts in awareness of a substantial risk that the circumstances exist or that his conduct will cause the result and his disregard is unjustifiable and constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation.

9 GCA § 4.30(c) (2005).

[the recklessness provision in the intoxication statute] is to preclude exculpation based upon intoxication when recklessness is the standard of the offense charged." *Id.* (citation omitted).

**[44]**     Because Simiron's convictions for Murder (as a First Degree Felony) and Manslaughter (as a First Degree Felony) as charged required the People to prove that Simiron committed the respective offenses "recklessly"—specifically, that Simiron "recklessly caused the death of another human"—the trial court did not abuse its discretion in refusing to apply the intoxication instruction to those offenses.

## V.  CONCLUSION

**[45]**     We **AFFIRM** the judgment of conviction and hold that, while the trial court committed instructional error that was clear and obvious under current law, Simiron's substantial rights were not affected.  We also hold that the trial court did not abuse its discretion in instructing the jury as to intoxication.


| /s/ | /s/ |
|:---:|:---:|
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |


/s/
F. PHILIP CARBULLIDO
Chief Justice